UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION AT LEXINGTON**

ASHLEY MAE WEBB,         )
                                    )
     Plaintiff,           )Civil Action No. 5:09-CV-314-JMH
                                      )
                                      )
v.                            )  **MEMORANDUM OPINION AND ORDER**
                                      )
                                      )
JESSAMINE COUNTY FISCAL    )
COURT, et al.,           )
                                      )
     Defendants.         )

                  ** ** ** ** **

    This action is before the Court on Defendants' Motion for Summary Judgment [Record No. 65]. Plaintiff has filed a Response [Record No. 70], and Defendants have made a Reply in further support of their Motion [Record No. 73]. The Court has also had the benefit of Plaintiff's Surreply [Record No. 76]. This motion is now ripe for decision and, for the reasons stated below, will be granted in part and denied in part.

**I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

    Plaintiff's amended complaint avers a number of claims against Defendants Jessamine County Fiscal Court, Jessamine County Judge-Executive William Neal Cassity, and Jessamine County Detention Center, in their official capacities, and Jailer Cecil Ray Moss, Deputy Jailer Tami Jean Teaven, Lt. James David Crowe, and Cpt. James Lynn Watts, in both their individual and official capacities. Plaintiff avers that Defendants "were deliberately indifferent to her serious medical needs, resulting in her being forced to endure

labor unassisted by any medical personnel, and to give birth to her daughter in the . . . holdover cell" at the Jessamine County Detention Center ("JCDC") in violation of her Eighth Amendment right to be free from cruel and unusual punishment. Plaintiff also avers Defendants' failures with respect to hiring, training, supervising, and disciplining JCDC employees led to this deprivation of Plaintiff's constitutional rights. Finally, she avers that Defendants were negligent and intentionally inflicted emotional distress upon her in violation of Kentucky common law. She bases her claims upon the facts set forth below.

Plaintiff was booked into the JCDC on August 25, 2006 at 10:46 p.m. At booking, Plaintiff told Teaven that she was nine months pregnant. Shortly after booking, Plaintiff told Teaven that she was suffering sharp back pains, that she was experiencing vaginal discharge, that the mucous plug had discharged from her cervix, and that she felt the urge to have a bowel movement but was unable to do so. Teaven gave Plaintiff an aspirin substitute at 3:01 AM after Plaintiff again complained to Teaven of cramping and feeling the urge to have a bowel movement although she was unable to do so. Plaintiff was moved to another cell because of her continued complaints of pain. JCDC Facility Event Reports show this move happened at 4:15 a.m. After she was moved to the new cell, Plaintiff again informed Teaven that she continued to feel the urge to have a bowel movement but could not do so.

Thirty minutes later Plaintiff told Teaven that her water had broken, but Teaven did not call for help. Rather, Teaven told Plaintiff to put her wet pants back on and stop urinating on herself. About forty-five minutes to an hour later, Plaintiff told Teaven that she could feel her baby crowning, but Teaven did nothing in response. Plaintiff informed Teaven that she could not meet with pre-trial services because she felt her "child was coming." Jail officials finally notified EMS at 6:50 A.M. once Teaven became convinced that Plaintiff's amniotic sac had ruptured. Plaintiff blacked out at some point, only to come to with EMS assisting her in delivering her baby.

On the night in question, Jailer Moss was not present at the JCDC, nor is there evidence that anyone was relaying the events at bar to him over the course of the hours that Webb labored. Of those remaining defendants present at the jail, Crowe knew that Webb was pregnant and had a view of the cells that Webb occupied that night from his post. Crowe heard a commotion from where Webb was housed and received Teaven's reports from Teaven. At some point, Crowe approached the door of Webb's cell, which he never entered, and told her to put her clothes back on and to "stop lying. . . and stop acting like a child." Watts knew that Plaintiff was pregnant and was aware to some extent of the complaints that prompted Teaven to transfer Webb from one cell to another as she labored, but he heard only reports from Crowe and

Teaven.  Ultimately, it was Watts who relayed the message from
Teaven to another guard that EMS was needed once Teaven decided to
make that request.

At the end of it all, Plaintiff delivered a healthy baby and
suffered no physical injuries during the delivery, but she was,
however, embarrassed and humiliated by the experience.

## II.  APPLICABLE STANDARD OF REVIEW

The standard for summary judgment mirrors the standard for
directed verdict.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
251 (1986).  A grant of summary judgment is proper "if the
pleadings, depositions, answers to interrogatories, and admissions
on file, together with the affidavits, if any, show that there is
no genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(c).

The moving party bears the initial burden to show the absence
of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477
U.S. 317, 323 (1986).  This burden is met simply by showing the
court that there is an absence of evidence on a material fact on
which the nonmoving party has the ultimate burden of proof at
trial.  *Id.* at 325.  The burden then shifts to the nonmoving party
to "come forward with some probative evidence to support its
claim."  *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir.
1994).  A material fact is one that may affect the outcome of the

issue at trial, as determined by substantive law. A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows "that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004).

The judge's function is not to weigh the evidence, but to decide whether there are genuine issues for trial. *Anderson*, 477 U.S. at 249; *Multimedia 2000, Inc. v. Attard*, 374 F.3d 377, 380 (6th Cir. 2004). The evidence should be construed in the light most favorable to the nonmoving party when deciding whether there is enough evidence to overcome summary judgment. *Anderson*, 477 U.S. at 255; *Summers*, 368 F.3d at 885.

## III. DISCUSSION

### A. Defendants Crowe, Watts, and Moss, in their Individual Capacity, Enjoy Qualified Immunity With Respect to Plaintiff's Claims Under 42 U.S.C. § 1983; Defendant Teaven Does Not.

Defendants ask this Court to evaluate whether they are entitled to qualified immunity with respect to Plaintiff's § 1983 claims against them in their individual capacity because "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once Defendants assert that they are due qualified immunity, "the burden

of proof [shifts] to the plaintiff to show that the defendant is not entitled to qualified immunity."[1] *Lanman v. Hinson*, 529 F.3d 673, 683 (6th Cir 2008).  To avoid summary judgment based on an assertion of qualified immunity, Plaintiff must first show "a violation of a constitutional right" and that the violated right "was 'clearly established' at the time of the defendant's alleged misconduct."  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Plaintiff's claims that her constitutionally secured right to be free from cruel and unusual punishment under the Eighth Amendment are discussed below.

### 1.   Delay in Providing Medical Care

In the case at bar, Plaintiff claims that the individual defendants violated the Eighth Amendment's prohibition against cruel and unusual punishment when they delayed seeking medical care for her while she was in labor.[2]  "The legal standard for asserting

---

[1] Plaintiff argues that *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001), applies to this Court's analysis of qualified immunity. [Record No. 70, p. 28]. *Yanero v. Davis*, however, relates solely to "qualified official immunity" as provided with respect to claims brought under Kentucky law, not qualified immunity under federal law.  *See, e.g., Williams v. Simpson*, No. 5:09CV-31-R, 2010 U.S. Dist. LEXIS 132915 (W.D. Ky. Dec. 15, 2010) (applying Kentucky's qualified official immunity doctrine solely to state law claims). Interestingly, Defendants have not raised qualified immunity under *Yanero* with respect to Plaintiff's state law claims.

[2] Plaintiff's right to proper medical care as a *pretrial detainee* arises from the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment.  *See Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (quoting *Ingraham v. Wright*, 430 U.S. 621, 671-72 n.40(1977)) ("Eighth Amendment scrutiny is appropriate only after the State has complied with the

an Eighth Amendment claim regarding medical care for prisoners is
'deliberate indifference,'" *Terrance v. Northville Reg'l
Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002), and
plaintiffs must meet a two-prong test that contains both an
objective and subjective component to show deliberate indifference
which rises to the level of "cruel and unusual punishment." U.S.
Const. amend VIII; *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).
As to the objective portion, "the deprivation alleged must be,
objectively 'sufficiently serious.'" *Farmer*, 511 U.S. at 834
(quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). The
plaintiff must then show that the prison official had a
"sufficiently culpable state of mind." *Id.* (quoting *Wilson*, 501
U.S. at 297). The Court considers these factors below.

---

constitutional guarantees traditionally associated with criminal
prosecutions."). While the Sixth Circuit has held "there is room
for debate over whether the Due Process Clause grants pretrial
detainees more protections than the Eighth Amendment does," both
parties have analyzed Plaintiff's cause of action as covered by the
standards set forth in the Eighth Amendment. As a result, any
additional protections provided by the Due Process Clause of the
Fourteenth Amendment to Plaintiff have been waived. *See Sanders v.
Armstrong*, No. 09-CV-036-JMH, 2011 U.S. Dist. LEXIS 13403, at *17-
20 (E.D. Ky. Feb. 10, 2011) (citations omitted) (holding that the
pretrial detainee waived any potential additional protections under
the Fourteenth Amendment after neither party argued they existed).
As the Fourteenth Amendment's Due Process Clause gives at least the
same amount of protection as the Eighth Amendment and both parties
argue the cause of action arises out of an Eighth Amendment
violation, this Court shall do likewise. *See Revere,* 463 U.S. at
244 ("[T]he due process rights of a [pretrial detainee] are at
least as great as the Eighth Amendment protections available to a
convicted prisoner.").

**a. A genuine issue of material fact exists as to whether Plaintiff presented an "objectively, 'sufficiently serious'" medical need.**

As an initial matter, it is well established that simply being pregnant – without more – does not constitute a serious medical condition. *See Patterson v. Carroll Cnty. Detention Ctr.*, No. 05-101-DLB, 2006 U.S. Dist. LEXIS 92507, at *13 n.5 (E.D. Ky. Dec. 20, 2006). As with any human condition, however, developments that "require immediate attention" can arise. *Id.* (quoting *Smith v. Franklin Cnty.*, 227 F. Supp. 2d 667, 677 n.10 (E.D. Ky. 2002)); *see also Coleman v. Rahija*, 1996 U.S. Dist. LEXIS 21702, at *17–18 ("[P]regnancy is not a serious medical need alone but . . . certain circumstances may exist in any particular case which would provide the basis for determining that a woman's pregnancy was a serious medical need.").

It comes as no surprise, then, that neither party disputes that an inmate in labor has a serious medical need. *See* [Record No. 70, p. 6] (citing multiple depositions) ("It has been admitted that an inmate being in labor would constitute a serious medical need."); [Record No. 73, p. 4] (Defendants' Response admitting Plaintiff suffered from a plainly obvious medical condition for which she received timely medical attention). The Court agrees. Simply stated, labor, whether premature as in *Patterson* or at term as in this case, is the type of development in a normal human condition which requires immediate attention under contemporary

standards of decency. *Cf. Estelle v. Gamble*, 429 U.S. 97, 102 (1976) ("[W]e have held repugnant to the Eighth Amendment punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society.'"). Attended births are the generally accepted norm in the United States, and "[h]aving medical assistance immediately preceding and during a birth is, in today's society, taken for granted."[3] *Doe v. Gustavas*, 294 F. Supp. 2d 1003, 1008 (E.D. Wis. 2003). Wherever a woman labors and ultimately delivers a baby, be it in a hospital, a birth center, her home, a jail cell, or anywhere else, most people expect and anticipate observation, monitoring, and care of the laboring woman and her baby in some capacity by an individual trained to assist during a birth.[4]

---

[3] The Court is taking judicial notice of the data collected by the World Health Organization. According to that data, in the United States of America, 99% of live births in 2005 and 99.4% of live births in 2006 were attended by skilled health personnel (defined as doctors, nurses, or midwives, "trained in providing life saving obstetric care, including giving the necessary supervision, care and advice to women during pregnancy, childbirth and the post-partum period; to conduct deliveries on their own; and to care for newborns"). *See* http://apps.who.int/ghodata/?vid=240 (last visited August 3, 2011).

[4] The Court is mindful that attitudes and expectations change over time, and attitudes and expectations concerning the care and the location of the care to be provided to a woman delivering a baby are not immune to change. For example, within the last century, births routinely took place at home. *See* Marian F. MacDorman, Fay Menacker & Eugene DeClerq, *Trends and Characteristics of Home and Other Out-of-Hospital Births in the United States*, 1999-2006, Nat'l Vital Stat. Rep., March 3, 2010, at 1 (stating that 44% of births reported in 1940 took place at home). Yet, in 2006, out-of-hospital births represented only 0.90% of the

Defendants argue, however, that Plaintiff has failed to demonstrate with "verifying medical evidence" that she was in labor at any time prior to when her amniotic sac ruptured, i.e., her water "broke," and that, thus, she was not actually experiencing an "objectively, 'sufficiently serious'" medical need which triggered an obligation on their part to obtain medical care prior to the time that EMS assistance was sought. Defendants' argument is

---

4,265,555 births reported in the United States. *Id.* at 2. Of that small percentage, 64.7% of out-of-hospital births were reported as occurring at home, 28.0% in a freestanding birth center, 1.1% in a clinic or doctor's office, and 6.2% elsewhere. *Id.* In other words, the vast majority of births in this country take place in a hospital setting and – obviously – attended by individuals trained to assist in labor and delivery, including doctors, midwives, and nurses.

Nonetheless, the Court would be remiss if it did not note that these more recent out-of-hospital births are also largely attended by individuals with training to assist in labor and delivery (making, of course, no assumption about the number of homebirths that were attended by skilled personnel in 1940). For example, of those births at home in 2006, 61% were reported as attended by midwives and 7.6% by physicians. *Id.* at 4. Only the remaining 36% were attended by "others," some of whom were trained to assist in birth. *Id.* These "others" included family members, emergency medical technicians, and anyone else would found themselves at the right place at the right time. *Id.*

All of this is to say that, the notion of "serious medical need" with respect to labor must and has kept up with the times because births attended by trained professionals – whatever the setting – are clearly the norm. *Cf. Harmelin v. Mich.*, 501 U.S. 957, 1014-15 (1991) (quoting *Stanford v. Kentucky*, 492 U.S. 361, 369 (1989) and *Weems v. United States*, 217 U.S. 349 (1910)) (observing that the Eighth Amendment has been interpreted "in a flexible and dynamic manner," mindful of the admonition that "time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions.")

flawed for the "'verifying medical evidence' requirement is relevant to those claims involving minor maladies or non-obvious complaints of a serious need for medical care." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 898 (6th Cir. 2004). It "does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers." *Id*.

Perhaps anticipating the weakness in their argument, Defendants urge this Court to conclude that a layperson would only readily discern that a woman is in labor and that a serious medical need has arisen upon the rupture of a woman's amniotic sac, commonly referred to as one's "water breaking." Defendants rely on *Patterson v. Carroll Cnty. Det. Ctr.*, No. 05-101-DLB, 2006 U.S. Dist. LEXIS 92057, at *12-14 (E.D. Ky. Dec. 20, 2006), in support of their bright-line proposition, but such a conclusion would be inappropriate. Indeed, determining that an "objectively, 'sufficiently serious'" medical deprivation has occurred without verifying medical evidence requires a fact specific analysis.

Rather than looking for a bright line in the course of labor, Courts consider the amount of time left before a pregnant inmate reaches the full term of her pregnancy, the symptoms of labor that she has exhibited, any previous or potential complications with respect to the inmate's pregnancy, and – ultimately – the reaction

of jail officials.[5]  *See Patterson v. Carroll Cnty. Det. Ctr.*, No. 05-101-DLB, 2006 U.S. Dist. LEXIS 92057, at *12-14 (E.D. Ky. Dec. 20, 2006); *Clifton v. Eubank*, No. 00-cv-2555-JLK, 2006 U.S. Dist. LEXIS 91043, at *15-18 (D. Colo Dec. 18, 2006); *Coleman v. Rahija*, No. 4-91-CV-50260, 1996 U.S. Dist. LEXIS 21702, at *17-18, 22-26 (S.D. Iowa Jan. 2, 1996).   Only after this type of analysis did the *Patterson* court determine – on the facts before it – that the plaintiff inmate's condition became manifestly serious when her water broke.

Patterson, who was only four to five months pregnant, had experienced no complications in her pregnancy prior to exhibiting cramping that would have led anyone to take "more robust action" until something other than cramping occurred. *Id.*  The case before this Court is easily distinguishable from that in *Patterson.* Patterson, unlike Plaintiff, was only in her second trimester and had complained of no "pregnancy-related medical problems" other than cramping for the five-and-a-half weeks she spent in the jail

---

[5] The Court notes that labor can be subtle at its outset with symptoms that are hard for anyone, including the woman who is experiencing those symptoms, to recognize as labor.  Nonetheless, it seems that the vast majority of women experiencing labor (and those around them) figure out that they are in labor in advance of the delivery of their babies by virtue of these symptoms as they accumulate and intensify.  Thus, they have time to seek care and comfort measures prior to delivery.  Further, as the undersigned recalls from personal experience awaiting the birth of my son, while birth is certainly imminent once the amniotic sac ruptures, a woman may be in labor and in need of an attendant for many hours before that event occurs.

before her water broke. *Patterson*, No. 05-101-DLB, 2006 U.S. Dist. LEXIS 92057, at *1-2. Thus, the comparison of Patterson with Plaintiff, who was nearing or at full term for her pregnancy and exhibiting significant signs of labor when she was booked at the facility where she would give birth less than twelve hours later, provides little useful guidance to this Court.

On the facts before it, the Court concludes that a reasonable jury could conclude that Webb had a "serious medical need" during the overnight hours in which she, at the end of her pregnancy term, experienced readily recognizable symptoms of labor. While the fact that Plaintiff was nine months pregnant alone would not show that a serious medical condition existed, it should have put anyone, including jail officials, on notice that labor and delivery would happen soon. Webb's advanced stage of pregnancy must then be considered together with the fact that, in the hours immediately after her booking, she experienced sharp back pain and severe cramping, i.e., contractions, and had the sensation that she was "burning up." Webb described the immense sensation of pressure during the course of her labor as the urge to have a bowel movement, even though she had been unable to have one since her intake at the jail. Webb experienced vaginal discharge and what she believed to be the discharge of the mucus plug, accumulated at the cervix during her pregnancy, from her body. Ultimately, yes, Webb's amniotic sac ruptured and the Court gathers that Webb's

clothing was wet from the fluid because Teaven remarked on the fact that Webb's clothing was wet on at least one occasion during the night. Finally, Plaintiff felt the sensation of the baby emerging from her body and, after a time, she experienced the birth of her child which provides the ultimate confirmation that she was, in fact, in labor.

On the facts before this Court, Plaintiff could clearly show that it would be obvious to a layperson that she was in labor on the night in question and was, thus, experiencing a serious medical condition. She can, thus, meet the objective burden necessary to show deliberate indifference rising to a violation of the Eighth Amendment.[6] When this Court views the evidence presented in the light most favorable to the nonmoving party, Plaintiff has shown that a reasonable jury could find Plaintiff's condition on the night in question was a known serious medical condition. There exists, then, a genuine issue of material fact as to whether

---

[6] Fortunately, in this matter, a healthy baby was born following a normal and, by all appearances, unremarkable course of labor and delivery. That fact goes to the amount of damages to be awarded, but it does not change the fact that the type of injury that Webb allegedly suffered is cognizable under the 8th Amendment. *See Coleman v. Rahija*, 114 F.3d 778, 787 (8th Cir. 1997) (upholding $1,000 compensatory damages award under § 1983 for physical pain and suffering and mental anguish and suffering even in the absence of complications during delivery where defendant unnecessarily delayed seeking attention for laboring inmate who was subjected to "'a great deal of fear and physical suffering [which] accompanied the prospect of having a baby on the floor of a penal institution' without the appropriate medical attention").

Plaintiff's condition was so serious that an "objectively, 'sufficiently serious'" deprivation of medical care could occur. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted); *Anderson*, 477 U.S. at 248, 255.

### b. Plaintiff has failed to show that Crowe, Watts, or Moss had the requisite state of mind to act deliberately but a genuine issue of material fact exists as to Teaven's state of mind.

The Court next considers whether Plaintiff's claims can survive summary judgment by evaluating the subjective portion of the deliberate indifference test. *Farmer*, 511 U.S. at 834. The subjective portion of the deliberate indifference test inquires into the culpability of a particular defendant, i.e., a defendants' state of mind. *Id.* at 842. While Plaintiff need not show "evidence of conscious intent to inflict pain," she "must demonstrate deliberateness tantamount to punish." *Horn* ex rel. *Parks v. Madison County Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994) (citations omitted). Thus, Plaintiff must "show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw that inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837). Circumstantial evidence can raise the inference that prison officials had knowledge, particularly when that risk was obvious, though "an official's failure to alleviate a significant

risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 842.

As an initial matter, the Court finds that a reasonable jury could conclude that Teaven perceived facts necessary to draw an inference that a serious medical condition existed and then disregarded that condition. It is undisputed that Teaven knew Plaintiff was nine months pregnant, and that Plaintiff informed Teaven of or that Teaven was witness to the multiple signs and symptoms of labor that Webb was experiencing on multiple occasions in the hours leading to the delivery of her child at the jail.

Three times Webb told Teaven that her amniotic sac had ruptured before Teaven finally called for help. Teaven even witnessed and made light of Webb's wet clothes, apparently soaked by Webb's amniotic fluid, telling Webb to stop urinating on herself. Teaven does not dispute this account except to say that she thought Plaintiff's complaints were "not real bad." Teaven Deposition, p. 16, line 8. Taking this evidence in the light most favorable to Plaintiff, the nonmoving party, for purposes of this motion *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986), this Court is persuaded that (1) a reasonable jury could find that Teaven perceived facts, first-hand, from which to infer that Plaintiff was in labor, (2) that the circumstantial evidence showed a risk so obvious such that Teaven drew the inference that

Plaintiff was in labor, and (3) that Teaven disregarded that risk.
*See Comstock v. McCrary*, 273 F.3d 694, 703 (6th Cir. 2001)
(citation omitted). Summary judgment is, thus, precluded on the
basis of qualified immunity for Teaven so long as the violated
right "was 'clearly established' at the time of the defendant's
alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232
(2009). Teaven has not suggested that the right to be free from
cruel and unusual punishment by virtue of deliberate indifference
to a serious medical need of an inmate was not "clearly
established" nor could she in light of long-established case law.
*See Estelle*, 429 U.S. at 104-105; *Patterson*, 2006 U.S. Dist. LEXIS
92507, at *13 n.5. Accordingly, Defendants' Motion for Summary
Judgment as to Plaintiff's claim of deliberate indifference to
Plaintiff's serious medical needs against Teaven in her individual
capacity shall be denied.

By contrast, neither Crowe, Watts, nor Moss were as involved
with Webb on the night that her child was born. Crowe knew that
Webb was pregnant and had a view of the cells that Webb occupied
that night from his post. Crowe heard a commotion from where Webb
was housed and received Teaven's reports of what was going on –
although what Teaven told Crowe is not part of the record before
the Court. Webb has testified that in the sole interaction she had
with Crowe, he told her through the door of her cell - a room that
he never entered – to put her clothes back on and to "stop lying.

. . and stop acting like a child," but the Court cannot say with any certainty that he was aware that her amniotic sac had ruptured because the Court does not know what he was told by his colleagues.[7]

Watts also knew that Plaintiff was pregnant and was aware to some extent of the complaints that prompted Teaven to transfer Webb from one cell to another as she labored, but he heard only reports from Crowe and Teaven and, so far as the Court knows, never actually observed Webb in the course of the night. As with Crowe, what Teaven and Crowe told Watts is not part of the record before the Court at this time, although no one disputes that it was Watts who relayed the message from Teaven to another guard that EMS was needed once Teaven decided to make that request. As for Moss, the jailer, Plaintiff has provided no evidence that he was present at the jail at any point during the night in question or that he had any reason to know, personally, that Plaintiff was either pregnant or in labor and in need of care.

In other words, there is no evidence of record which suggests that these Defendants had sufficiently specific knowledge of the

---

[7] Plaintiff also states that Crowe made derisive comments about her situation to Plaintiff but does not cite to any portion of the evidence of record in support of this argument. Rule 56 requires citation to the record in support of factual positions, and that this Court need not consider materials in the record not cited by the parties. *See* Fed. R. Civ. P. 56; *Smith v. ACO, Inc.*, 368 F. Supp. 2d 721, 736 (E.D. Mich. 2005) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)) ("Judges are not like pigs, hunting for truffles buried in the record].").

outward signs of labor exhibited by Plaintiff in the course of the night.  Crowe and Watts could do no more than perceive that an objectively serious risk could become present since Plaintiff was close to the end of her term of pregnancy, but that is not enough. Moss knew nothing because he was not there and there is no evidence that any of these events were communicated to him on the night in question.  As a result, this Court will grant Defendants' Motion for Summary Judgment as to Plaintiff's claim of deliberate indifference to serious medical needs against Crowe, Watts, and Moss in their individual capacities, as Crowe, Watts , and Moss are entitled to qualified immunity with respect to this claim.

### 2. Hiring, Training, Supervison, and Discipline of Jail Employees

Plaintiff has also averred a cause of action against Defendants, in both their individual and official capacities, for violating her constitutional right of protection from cruel and unusual punishment by being "deliberately indifferent in hiring, training, supervising and disciplining employees, creating widespread practices and customs that gave rise to the violations of Plaintiff's rights outlined therein." [Record No. 45].  Again, Defendants, in their individual capacity, have made a motion for summary judgment based on qualified immunity.  Thus, as previously stated, the Court must consider "whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right" and "whether the right at issue was 'clearly established' at

19

the time of the defendant's alleged misconduct" to determine whether Defendants may assert qualified immunity as to these claims. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

With respect to her argument that her constitutional rights were violated by the jail's hiring practices, Plaintiff's claim is woefully lacking in form or substance. At best, the Court understands her argument to be that Jailer Moss hired Teaven without confirming that she was, in fact, a certified nursing assistant ("CNA") as claimed on her resume. [*See* Record No. 70, p. 25] (the only place where the word "hire" appears in Plaintiff's Response or Sur-reply). To succeed on a claim of negligent hiring, Plaintiff would need to show that something in Teaven's record made it plainly obvious that hiring her in such a fashion would lead to the deprivation of Plaintiff's constitutional right. *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 412 (1997).

Webb has not articulated, let alone demonstrated with evidence of record, anything about Teaven's application or history which would have made make it plainly obvious to Moss that a constitutional violation would result if Teaven became an employee of the jail. It is not enough for Webb to argue that Moss failed to confirm Teaven's work history and training reported on her application, because she has not articulated and, thus, cannot demonstrate how failure to do so would show that Moss should have

know that hiring Teaven would create a serious risk to others and then consciously ignored that risk.  Her claim fails.

With respect to Webb's failure to train claim, the Sixth Circuit requires Plaintiff to "point to a specific action of each individual supervisor to defeat a qualified immunity claim." *Phillips v. Roanee Cnty*, 534 F.3d 531, 543-44 (6th Cir. 2008). Plaintiff has failed to do so.  In the absence of a specific action that the Court might evaluate (or even an account of who was supervising who on the night in question), there can be no genuine issue of material fact.  Rather, there is a failure of evidence with respect to  Plaintiff's claims against Defendants, in their individual capacity, for failing to train employees.

Neither can Plaintiff demonstrate that any of the defendants violated her constitutional right to be free from cruel and unusual punishment through their deliberate indifference with respect to supervision of jail employees.  Since  § 1983 liability does not arise from the failure to control employees,

> a supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it.  At a minimum a plaintiff must show that the official at least impliedly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."

*Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson Cnty.*, 668 F.2d 869, 874 (6th Cir. 1982)).

Plaintiff argues that Jailer Moss encouraged the conduct at bar and, thus, impliedly authorized, approved, or knowingly acquiesced in the conduct of Teaven, Watts, and Crowe when he authorized Teaven, because she was a CNA, to decide when to call for emergency medical assistance for an inmate. This was, she claims, in direct contradiction of state statute and the JCDC policy and procedures manual and somehow injured her. The Court is not immediately persuaded that this authorization was in violation of the JCDC policy and procedures manual, which provided that an "officer confronted with a medical emergency will . . . call the Facility Physician, Physician Assistant, or 911 in accordance with the medical emergency plan, and relay the emergency information." [Record No. 70-35.] According to the Medical Emergency Care Plan, officers were to "[t]elephone the Emergency Transport Unit if needed, and/or the Facility Physician or Physician Assistant," among other things. *Id*. Further, even though Moss has admitted that a CNA would not be able to make a diagnosis of illness or medical condition in an inmate as would a physician, Webb still has not articulated how the decision to assign that evaluative task to a CNA generally or Teaven, specifically, led to the harm she allegedly experienced upon a theory of failure to supervise. Her claim fails on this ground, as well.

Finally, Plaintiff cannot demonstrate that any defendant violated her constitutional rights by means of discipline or lack

of discipline of JCDC employees. "Under § 1983, the issue is whether [Defendants] violated the Constitution, not whether [Defendants] should be disciplined." *Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir. 1992) (holding that the failure to discipline a police officer for allegedly violating police policy did not, on its own, establish a constitutional violation). *Cf. Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989) (citing *Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985) (holding that failing to investigate and discipline employees could show a policy or custom of ratifying unconstitutional acts for purposes of finding Defendants in their official capacity or a municipality liable under 42 U.S.C. § 1983). Plaintiff has made no effort to articulate how investigatory and disciplinary practices at the jail where she was housed violated her constitutional rights. It follows that this claim must fail.

Since Webb has failed to identify a wrong of constitutional proportions with respect to hiring, training, supervision, or discipline, Crowe, Watts, Teaven, and Moss enjoy qualified immunity, and the Court shall grant Defendants' Motion for Summary Judgment as to Plaintiff's cause of action against Defendants, in their individual capacities for all remaining allegations under 42 U.S.C. § 1983, except as set forth above, and Plaintiff's claim against them shall be dismissed.

**C. Plaintiff's 42 U.S.C. § 1983 Claims Against Jessamine County Fiscal Court, the JCDC, and the Individual Defendants, in their Official Capacities, Fail.**

Next, the Court understands Plaintiff's cause of action against Defendants in their official capacities as claims against the office they represent, namely the JCDC, which is, in turn, for all purposes the Jessamine County Fiscal Court. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989)("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the office."). The Court, therefore, must determine "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the [municipality] is responsible for that violation." *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992).

However, "a local government cannot be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003)(citing *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995) ("[section] 1983 liability cannot be premised on a theory of respondeat superior."). It is only when the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* In order to show a policy or custom, Plaintiff "must (1) identify the municipal policy or custom, (2) connect the policy to the

municipality, and (3) show that [her] particular injury was incurred due to the execution of that policy." *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003) (numbers in original) (citation omitted). Further, "a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage' with the force of law." *City of St. Louis v. Proprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)).

Here, Plaintiff's claim against the Jessamine County Fiscal Court and the individual defendants in their official capacities must fail as she has not identified a policy or custom – whether with respect to the provision of care or with respect to hiring, training, supervision, or discipline of JCDC employees – which inflicted her injury and which would make these defendants responsible under § 1983. Webb has not shown that there exists any written law or express municipal policy of the Jessamine County Fiscal Court or the existence of a widespread practice at the JCDC that ultimately caused her injury and which could subject the county to liability.

Plaintiff has drawn the Court's attention to the JCDC policy and procedure manual which sets forth the medical emergency plan for the JCDC, but she fails to articulate how that policy and procedure manual caused her harm. Rather, it strikes the Court that she believes that it was a failure to adhere to that plan which caused her the injury of which she complains. Plaintiff has

also argued that Jailer Moss's practice of allowing an officer who is a CNA to decide when to call for additional medical help could qualify as a widespread custom at the JCDC. However, even if this Court accepted that such a practice was a custom for the purposes of this analysis, Webb has not demonstrated how that policy caused her injury because it does not – on its face – direct the conclusion that employees should delay seeking aid for inmates laboring in the jail.

Plaintiff has not demonstrated with evidence any actions on the part of JCDC staff which reveal "deeply embedded traditional ways of carrying out state policy [reflecting] a course of action deliberately chosen from among various alternatives" which can be said to be attributable to the Jessamine County Fiscal Court. *Cash v. Hamilton Cnty. Dep't of Adult Probation*, 388 F.3d 539, 543 (6th Cir. 2004) (quoting *Doe v. Claiborne Cnty.*, 103 F.3d 495, 507-08 (6th Cir. 1996)). Rather, the evidence shows, at best, a single set of decisions made and actions taken by an individual or individuals who were jail employees on the night in question, and "[n]o evidence indicates that this was anything more than a one-time isolated event for which the county is not responsible." *Fox v. Van Oosterum*, 176 F.3d 342, 348 (6th Cir. 1999) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978)); *see also* [Record No. 70, pp. 17-20, pp. 21-25].

Without a municipal policy or custom directing the actions of those employees, Jessamine County Fiscal Court cannot be held

liable under 42 U.S.C. § 1983. On the facts before this Court, no reasonable jury could find that Plaintiff has shown a policy or custom of the Jessamine County Fiscal Court caused her Eighth Amendment rights to be violated and this Court shall grant Defendants' Motion for Summary Judgment as to Plaintiff's claims against the Jessamine County Fiscal Court, the JCDC, and the individual defendants in their official capacities. *See Cash*, 388 F.3d at 543 (quoting *Claiborne Cnty.*, 103 F.3d at 508); *see also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986).

**D. Plaintiff's State Law Claims for Negligence and Intentional Infliction of Emotion Distress Fail.**

**1. Jessamine County Fiscal Court, JCDC, and Individual Defendants in Their Official Capacities Are Immune from Plaintiff's Common Law Claims.**

Under Kentucky law, "[b]ecause [Jessamine County] is a political subdivision of the state, it is 'cloaked' with sovereign or governmental immunity" except where it is waived by the General Assembly. *Jones v. Cross*, 260 S.W.3d 343, 345 (Ky. 2008) (citing *Lexington–Fayette Urban County Gov't v. Smolcic,* 142 S.W.3d 128 (Ky. 2004)); *Commonwealth v. Whitworth*, 74 S.W.3d 695, 699 (Ky. 2002) ("[T]he state cannot be sued except upon a specific and explicit waiver of sovereign immunity."). Because Defendant JCDC is not *sui generis, see* Kentucky Constitution §§ 99 and 144 and, generally, KRS, Chapters 71 and 441 (jails are facilities owned and provided for by the county fiscal court and operated by the jailer), as go the claims against the Jessamine County Fiscal Court, so go the claims against JCDC.

Additionally, the absolute immunity from suit afforded to the county, as a political subdivision of the state, also extends to county officials sued in their representative or official capacities when the state is the real party against whom relief is sought. *Yanero v. Davis*, 65 S.W.3d 510, 518 (Ky. 2001). Here, because Plaintiff's claims against the Jessamine County Fiscal Court and the individual defendants in their official capacities allege wrongful operation of the jail, they are claims against the Defendant Jessamine County Fiscal Court and any immunity belonging to the county will also be enjoyed by the individual defendants in their official capacity.

Plaintiff argues, however, that the General Assembly has waived this immunity with respect to the care and keeping of inmates by virtue of KRS § 71.040, which states:

> At the time of booking, the jailer shall receive and keep in the jail all persons who are lawfully committed thereto, until they are lawfully discharged, unless the person is in need of emergency medical attention, in which case the arresting officer shall obtain medical attention for the person prior to delivery to the jail. The jailer shall treat them humanely and furnish them with proper food and lodging and confinement. He shall deliver those who die in jail to their friends, if requested, or have them decently buried at the expense of the county.

KRS § 71.040. Construing this statute "strictly. . . in favor of the state" absent a clearly expressed intention of the legislature to do otherwise and giving the words "their literal, usual and ordinary meaning" in the absence of any ambiguity, the Court concludes that there has been no waiver of immunity by the

legislature by means of KRS § 71.040.[8] *Jones v. Cross*, 260 S.W.3d 343, 345-346 (Ky. 2008) (citing *Lexington-Fayette Urban Cnty. Bd. of Health v. Bd. of Trs. of the Univ. of Ky.*, 879 S.W.2d 485, 486 (Ky. 1994)); *see e.g.*, *Grayson Cnty. Bd. of Educ. v. Casey*, 157 S.W.3d 201, 207 (Ky. 2005) (holding that "sue and be sued" in KRS § 160.160(1) constituted a waiver of immunity). Thus, official immunity is enjoyed by the county and the individual defendants, in their official capacities, as to Plaintiff's tort claims arising out of Kentucky law. The Court will grant Defendants' Motion for Summary Judgment and dismiss Plaintiff's state law claims for negligence and intentional infliction of emotional distress against Defendants Jessamine County Fiscal Court and JCDC and the individual defendants in their official capacities.

> **2. Plaintiff's Claims of Negligence Against Crowe, Watts, and Moss, in Their Individual Capacities and Intentional Infliction of Emotional Distress Against All Defendants, in Their Individual Capacities, Fail.**

Defendants, in their individual capacities, have also shown that no genuine issue of material fact exists with respect to whether Plaintiff can demonstrate an injury resulting from their negligence. "Negligence, under Kentucky law, requires a showing of

---

[8] Further, the language in KRS § 71.040 is clearly distinct from that in KRS § 70.040 ("[t]he sheriff shall be liable for the acts or omissions of his deputies . . . .") upon which Plaintiff relies to urge this Court to conclude that immunity has been waived by the legislature. *See e.g.*, *Cross*, 260 S.W.3d at 345-46 (holding that the language of KRS § 70.040 expressed a clear waiver of immunity leaving "no room for any other reasonable construction").

duty, breach of duty, and resulting injury."[9]  *Smith v. Franklin County*, 227 F. Supp. 2d 667, 682 (E.D. Ky. 2002) (citing Workman v. Columbia Natural Resources, 864 F. Supp. 638, 641 (E.D. Ky. 1994)); *Illinois Cent. R.R. v. Vincent*, 412 S.W.2d 874, 876 (Ky. 1967). Here, the General Assembly has charged jailers with the duty to "treat [inmates] humanely and furnish them with proper food and lodging and confinement," which undoubtedly includes summoning necessary medical care or assistance for instances of serious medical need. KRS § 71.040. Furthermore, state regulation and the JCDC Manual provide that "[e]mergency medical, vision, and dental care shall be available to all prisoners commensurate with the level of care available to the community." 501 KAR 3:090(12); *see also* [Record No. 70-34] (JCDC Manual). As Kentucky statute has codified negligence per se arising out of violations of either Kentucky statute or administrative regulations enacted under the context of public safety, this Court finds Defendants had a duty to

---

[9] Defendants argue that Kentucky law further requires a plaintiff to suffer physical harm to state a cause of action for negligence, relying on this Court's 2002 decision in *Smith v. Franklin County*, 227 F. Supp. 2d 667 (E.D. Ky. 2002). This Court did not, however, reach that conclusion in *Smith*. In that case, this Court focused on the requirement that the injury necessary for a claim of negligence must result from a breach of a given duty, i.e., this Court focused largely on causation, in determining that Smith had failed to demonstrate that the actions of jail officials resulted in the seizure of which she complained. *Smith*, 227 F. Supp. 2d at 682-83. It was only with respect to Smith's complaint that jail officials were negligent in failing to provide her with care after she experienced the seizure that the Court determined her negligence claim failed because she had not demonstrated any injury whatsoever in the form of a "subsequent or lasting impact on her well-being," since that was the type of injury Smith claimed. *Id*. at 683.

provide "emergency medical care commensurate with the level of care available to the community." *Ctr. Coll. v. Trzop*, 127 S.W.3d 562, 567 (Ky. 2003) (citation omitted); *see also* KRS § 446.070 ("A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation . . . .").

A genuine issue of material fact exists, however, only to Teaven's actions regarding Plaintiff's negligence claim. Teaven was aware that Webb needed assistance but failed to take action to obtain the care Plaintiff needed. Meanwhile, Plaintiff labored for hours – with all that entails – in a jail cell without assistance. Between the discomfort and the pain from the contractions, the intense pressure that resulted from the baby passing through the labor canal, the bodily fluids that soaked her clothes, and the very intimate act of a baby finally emerging from her body, she claims that she suffered embarrassment and humiliation as she labored and gave birth to her baby, unattended by caregivers and in the face of Teaven's not so tender ministrations, even though fortunately neither Plaintiff nor her child suffered physical harm as a result. The fault, however, is Teaven's if it is anyone's. As explained elsewhere in this Memorandum Opinion and Order, she had the knowledge from which they duty to take action arose. The evidence of record does not show that Moss, Crowe, or Watts had the requisite knowledge. Accordingly, the claim of negligence shall be dismissed as to Defendants Moss, Crowe, and Watts, in their individual capacities.

That said, Plaintiff has brought forth no evidence to demonstrate that Defendants acted with an "intent to cause Webb emotional distress" as required by Kentucky. *See Smith v. Franklin Cnty.*, 227 F. Supp. 2d 667, 683-84 (E.D. Ky. 2002) (citing *Gross v. Citizens Fid. Bank*, 867 S.W.2d 212, 215 (Ky. Ct. App. 1993); *Ragas v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. Ct. App. 1993)). While she may be able to demonstrate that Teaven failed to call for aid and that Teaven may have even been somewhat crass in her interactions with Webb while she labored, she has not demonstrated that Teaven or anyone else acted with the necessary intent to cause her emotional distress. Since Plaintiff must "come forward with some probative evidence to support [her] claim" or find herself subject to summary judgment, *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994), the Court will grant Defendants' Motion for Summary Judgment as to Plaintiff's claim of intentional infliction of emotional distress against Defendants in their individual capacities.

**IV. Conclusion**

For the reasons stated above, **IT IS ORDERED**:

(1) that Defendants' Motion for Summary Judgment [Record No. 65] shall be **GRANTED, IN PART,** and **DENIED, IN PART**;

(2) that Plaintiff's claims under 42 U.S.C. § 1983 against the Jessamine County Fiscal Court; the Jessamine County Detention Center; Defendants Cecil Ray Moss, James David Crowe, James Lynn Watts, and Tami Jean Teaven, in their official capacities; and

Defendants Cecil Ray Moss, James David Crowe, and James Lynn Watts, in their individual capacities, shall be **DISMISSED WITH PREJUDICE**; and

(3) that Plaintiff's claim of Intentional Infliction of Emotional Distress against all Defendants shall be **DISMISSED WITH PREJUDICE.**

(4) that Plaintiff's claim of Negligence against the Jessamine County Fiscal Court; the Jessamine County Detention Center; Defendants Cecil Ray Moss, James David Crowe, James Lynn Watts, and Tami Jean Teaven, in their official capacities; and Defendants Cecil Ray Moss, James David Crowe, and James Lynn Watts, in their individual capacities, shall be **DISMISSED WITH PREJUDICE.**

This the 5th day of August, 2011.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge